An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-725
NORTH CAROLINA COURT OF APPEALS

Filed: 3 March 2015

STATE OF NORTH CAROLINA

    v.

CHANTE MICHELLE STERLING,
    Defendant.

Mecklenburg County
Nos. 11 CRS 255751–52

Appeal by Defendant from judgments entered 19 December 2014 by Judge James W. Morgan in Superior Court, Mecklenburg County. Heard in the Court of Appeals 5 January 2015.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Phillip K. Woods, for the State.*
>
> *Michelle FormyDuval Lynch for Defendant–Appellant.*

McGEE, Chief Judge.

Chante Michelle Sterling ("Defendant") appeals from judgments entered upon jury verdicts finding her guilty of committing two counts of identity theft, two counts of obtaining property by false pretense, one count of financial transaction card theft, and one count of financial transaction card fraud. We find no error.

## I.   Facts and Procedural History

Defendant began working at the corporate office of Belk in

Charlotte, North Carolina, in March 2011 as a human resources information systems manager. Defendant worked in a cubicle next to Megan Murray ("Mrs. Murray"), who was employed as a senior human resources information systems analyst. Mrs. Murray's maiden name is McWaters, and McWaters was still listed on Mrs. Murray's credit cards at the time. Mrs. Murray kept her credit cards in her wallet in the bottom drawer of her desk in her cubicle. At that time, Mrs. Murray was not using her Wells Fargo credit card because she was trying to pay down the balance. However, in May 2011, she noticed from her credit card statement that the balance was increasing and there were transactions that she had not authorized. Mrs. Murray realized that her Wells Fargo credit card and one other credit card were missing from her wallet and called the credit card company to cancel the cards. The unauthorized transactions included charges at the Dry Cleaning Spot, Target, and several restaurants and businesses close to the Belk office, including the Belk Cafe, which only employees in the Belk office could access.

Kathy Prince ("Mrs. Prince") worked as a stylist for Belk in 2011, and her husband owned the Dry Cleaning Spot. Mrs. Prince testified at trial that Joe Byrd, a maintenance technician at Belk, brought Defendant to Mrs. Prince's office in 2011 so Defendant could set up an account with the Dry Cleaning Spot to have her dry cleaning done. Mrs. Prince testified that she called her sister-

in-law at the Dry Cleaning Spot and then stepped out of her office to give Defendant privacy as she gave her credit card information. Defendant had introduced herself to Mrs. Prince as "Megan," and then left a piece of paper with Mrs. Prince on which Defendant had written the name Megan and her cell phone number. Mrs. Prince later used that cell phone number to contact Defendant so she could return Defendant's dry cleaning to her in the Belk parking lot.

Mrs. Murray testified that approximately three weeks after reporting the card stolen, she received a call from Mrs. Prince asking why the charges for the dry cleaning services had been cancelled. Mrs. Murray said she had not had any dry cleaning done, and told Mrs. Prince that her card had been stolen. When Mrs. Murray asked for a description of the woman who had dropped the dry cleaning off, Mrs. Prince described the woman as African-American with dark brown hair. Mrs. Murray then told Mrs. Prince that she, herself, was Caucasian and had blonde hair. Mrs. Prince gave Mrs. Murray the cell phone number and work extension that the woman had left with Mrs. Prince in order to have her dry cleaning returned. Mrs. Murray then identified the work extension number and cell phone number as those of Defendant.

Raymond Griffin ("Mr. Griffin") worked in Marietta, Georgia, as an investigations technician for Target in 2011. Mr. Griffin testified that, upon the request of a detective, he pulled the

surveillance video and receipts for transactions on Megan McWaters' credit card and Chante Sterling's credit card at a Target store in Charlotte. During voir dire, Mr. Griffin testified that each Target store saved surveillance video, which he could remotely access using secured servers. Mr. Griffin pulled the video remotely, saved it to his computer, burned this to a disc, deleted the files off his computer, and locked the disc in a file cabinet. The jury viewed this video and was provided with a printout of the corresponding transactions made by credit cards for Megan McWaters and Chante Sterling at 12:38 p.m. and 12:39 p.m., respectively, on 8 May 2011 at Register 78 in Target Store 762. Mr. Griffin testified that he reviewed the surveillance video, had reviewed nearly one hundred other surveillance videos, and based on his understanding, the camera was maintained and operating correctly. He also testified the video played in court was the same one he had viewed while burning the requested video and receipts to the disc.

Nicole Washington–Dean ("Ms. Washington-Dean") testified that she hired Defendant in 2011 and, during the period Defendant was employed at Belk, she knew Defendant well enough to recognize her voice. During the investigation concerning Defendant, Bob Vranek ("Mr. Vranek"), a Vice President of Loss Prevention at Belk, placed several calls to Defendant's cell phone number and, when he finally

reached her, put the call on speakerphone and called Ms. Washington-Dean on a separate telephone line to see if she could verify that Mr. Vranek was speaking with Defendant. Ms. Washington-Dean testified that she recognized the voice to be Chante Sterling's, and heard the person identify herself as Chante Sterling. Mr. Vranek testified that, when confronted with the information about Mrs. Murray's stolen credit cards, the person identifying herself as Chante Sterling initially denied taking the cards, but then admitted to taking the cards and using one of the cards at Target, the Dry Cleaning Spot, and a few other locations because she was having financial difficulties.

Defendant was indicted on two counts of obtaining property by false pretense, one count of financial transaction card fraud, one count of financial transaction card theft, and two counts of identity theft. A jury found Defendant guilty of all charges and Defendant was sentenced to a minimum of thirteen months' and a maximum of sixteen months' imprisonment. Defendant appeals.

## II. Analysis

### A. Sufficiency of the Indictments

Defendant first argues the trial court did not have jurisdiction to try her on the charge of obtaining property by false pretense or on one of the charges of identity theft because the indictments for both charges were fatally defective. We

disagree.

This Court applies a *de novo* standard of review to indictments alleged to be facially invalid because a facially invalid indictment would "deprive[] the trial court of jurisdiction to enter judgment in a criminal case." *State v. Haddock*, 191 N.C. App. 474, 476, 664 S.E.2d 339, 342 (2008). "To be sufficient under our Constitution, an indictment must allege lucidly and accurately all the essential elements of the offense endeavored to be charged." *State v. Hunt*, 357 N.C. 257, 267, 582 S.E.2d 593, 600 (internal quotation marks omitted), *cert. denied*, 539 U.S. 985, 156 L. Ed. 2d 702 (2003). "An indictment is not facially invalid as long as it notifies an accused of the charges against him sufficiently to allow him to prepare an adequate defense and to protect him from double jeopardy." *Haddock*, 191 N.C. App. at 476–77, 664 S.E.2d at 342. The accused has sufficient notice "if the illegal act or omission alleged in the indictment is clearly set forth so that a person of common understanding may know what is intended." *Id.* at 477, 664 S.E.2d at 342 (internal quotation marks omitted). "In general, an indictment couched in the language of the statute is sufficient to charge the statutory offense." *State v. Blackmon*, 130 N.C. App. 692, 699, 507 S.E.2d 42, 46, *cert. denied*, 349 N.C. 531, 526 S.E.2d 470 (1998).

1.    Obtaining Property by False Pretense

The elements of the offense of obtaining property by false pretense are:

> (1) "knowingly and designedly by means of any kind of false pretense;" (2) "obtain[ing] or attempt[ing] to obtain from any person . . . any money, goods, property, services, chose in action, or other thing of value;" (3) "with intent to cheat or defraud any person of such money, goods, property, services, chose in action or other thing of value."

*State v. Jones*, 367 N.C. 299, 307, 758 S.E.2d 345, 351 (2014) (quoting N.C. Gen. Stat. § 14-100(a) (2013)).  The general rule is that "the thing obtained by the false pretense . . . must be described with reasonable certainty, and by the name or term usually employed to describe it."  *Id.* (internal quotation marks omitted).

In the present case, the relevant portion of the indictment for obtaining property by false pretense read:

> Chante Michelle Sterling, did unlawfully, willfully, feloniously, knowingly, and designedly with the intent to cheat and defraud[,] *obtain services for dry cleaning from P3 Holdings LLC, a limited liability company, doing business as Dry Clean[ing] Spot*, by means of a false pretense which was calculated to deceive and did deceive.

(Emphasis added.)  Defendant argues the indictment was defective because it did not charge her with obtaining property and did not describe the service with any specificity.  Defendant asserts that, under our Supreme Court's reasoning in *State v. Jones*, 367 N.C.

299, 307–08, 758 S.E.2d 345, 351 (2014), "the term 'services' does not describe with reasonable certainty the property obtained by false pretenses." We disagree.

In *Jones*, "the indictments alleged that [the defendant] obtained 'services' from Tire Kingdom and Maaco." *Jones*, 367 N.C. at 307, 758 S.E.2d at 351. However, the Court determined that "services" was "not the name or term usually employed to adequately describe the tires, rims, wiper blades, tire and rim installation, wheel alignment, and brake services [the defendant] allegedly obtained from Tire Kingdom, or the paint materials and service, body supplies and labor, and 'sublet/towing' services [the defendant] obtained from Maaco." *Id.* at 308, 758 S.E.2d at 351. Thus, the Court determined that, "[l]ike the terms 'money' or 'goods and things of value,' the term 'services' does not describe with reasonable certainty the property obtained by false pretenses." *Id.* at 307–08, 758 S.E.2d at 351. Accordingly, the Court in *Jones* held that "the indictments were insufficient to allege the crime of obtaining property by false pretenses[.]" *Id.*

However, we are not persuaded as Defendant contends in the present case, that an indictment that described the property obtained by false pretense as "services for dry cleaning" from a specifically named dry cleaning vendor failed to describe the property obtained with reasonable certainty. Since the term

"services for dry cleaning" *is* "the name or term usually employed to adequately describe" the type of service one usually obtains from a dry cleaner, *cf.* *id.*, we conclude that the indictment described with reasonable certainty the thing of value that was obtained by false pretense.  Therefore, the trial court had jurisdiction to try Defendant for this charge.

### 2.   Identity Theft

The elements of identity theft are:

> A person who knowingly obtains, possesses, or uses identifying information of another person, living or dead, with the intent to fraudulently represent that the person is the other person for the purposes of making financial or credit transactions in the other person's name, to obtain anything of value, benefit, or advantage, or for the purpose of avoiding legal consequences[.]

N.C. Gen. Stat. § 14-113.20(a) (2013).

In the present case, the relevant portion of the indictment charging Defendant with identity theft read:

> Chante   Michelle   Sterling   unlawfully, willfully and feloniously did knowingly use personal identifying information, of another person, Megan Murray, without that person's consent, with the intent to fraudulently represent that [D]efendant was the other person *for the purpose of making financial and credit transactions* in the other person's name.

(Emphasis added.)  Defendant argues that the indictment charging her with identity theft was defective because it did not indicate

what transactions actually occurred and did not allege that anything of value or benefit was obtained. We disagree.

Because the third element of the statute is written in the disjunctive, an indictment sufficiently charges the elements of the offense if it alleged a defendant knowingly used identifying information of another person, with the intent to fraudulently represent the defendant was the other person, for any of the following three reasons: (1) "for the purposes of making financial or credit transactions in the other person's name, [(2)] to obtain anything of value, benefit, or advantage, or [(3)] for the purpose of avoiding legal consequences." *See* N.C. Gen. Stat. § 14-113.20; *cf. Jones*, 367 N.C. at 305, 758 S.E.2d at 349–50 (considering a challenge to an indictment for identity theft which examined evidence supporting only whether the defendant intended to defraud several individuals "for the purposes of making financial or credit transactions in [those individuals'] name[s]" (alterations in original)). Because the language in the indictment was couched in the statutory language, it was specific enough to inform Defendant of the offense of which she was accused. *See Blackmon*, 130 N.C. App. at 699, 507 S.E.2d at 46. Therefore, the indictment for identity theft was not fatally defective, and the trial court had jurisdiction to try Defendant for this charge.

B. <u>Admission of Testimony Regarding Telephone Conversation</u>

Defendant next argues the trial court erred by allowing the presentation of testimony of a telephone conversation with Defendant, during which she admitted to taking and using Megan Murray's credit card, because the State did not lay a proper foundation for the admission of this testimony. We disagree.

"For a court to allow a witness in a criminal case to testify to the content of a telephone conversation, the identity of the person with whom the witness was speaking must be established." *State v. Dial*, 122 N.C. App. 298, 309, 470 S.E.2d 84, 91, *disc. review and cert. denied*, 343 N.C. 754, 473 S.E.2d 620 (1996). "[I]dentity may be established by testimony that the witness recognized the other person's voice, or by circumstantial evidence." *Id.*

In this case, there was sufficient evidence to identify Defendant as the person with whom Mr. Vranek and Ms. Washington-Dean were speaking to lay a proper foundation for admission of the testimony. First, Ms. Washington-Dean testified that, during the call to Defendant's cell phone number, she could hear the speaker clearly, heard the speaker identify herself as Chante Sterling, and recognized the voice as Defendant's. Furthermore, Ms. Washington-Dean testified that she had employed Defendant in 2011, saw and spoke to Defendant during the time Defendant worked at Belk, and knew Defendant well enough to recognize her voice. This

testimony was sufficient to establish that Ms. Washington-Dean recognized Defendant's voice.

There is also ample circumstantial evidence to establish Defendant as the person to whom Mr. Vranek placed the call. Mr. Vranek testified he placed a call to Defendant's cell phone number, which had been obtained through Belk's contact protocol, and the person who answered the cell phone identified herself as Chante Sterling. Mr. Vranek testified he placed the call on speakerphone and then made a call to Ms. Washington-Dean on a second phone in order that she could verify that the person speaking was Defendant. The voice of the woman who identified herself as Chante Sterling remained the same throughout the phone call and the substance of the call revolved around the theft of Mrs. Murray's credit cards. The person identifying herself as Chante Sterling initially denied taking Mrs. Murray's credit cards, but then admitted to taking one of the cards and using it due to financial problems. The person said that she used the card at "several different places, one was the dry cleaner, one was Target, [and] there were a few others." While there was some discrepancy as to exactly how this call transpired, both Ms. Washington-Dean and Mr. Vranek testified that the person identifying herself as Chante Sterling said she was in an airport and both testified they heard background noise matching this location. Based on this evidence, the identity of the person

to whom the call was placed was established to be Defendant and, therefore, the trial court did not err by admitting Mr. Vranek's and Ms. Washington-Dean's respective testimony that Defendant admitted to taking and using Mrs. Murray's credit card.

C.   Admission of Evidence of Other Crimes, Wrongs, or Acts

Defendant next argues the trial court erred by admitting evidence of credit card transactions other than the two charges for which Defendant was on trial because there was no evidence that Defendant was the person who had used Mrs. Murray's credit card to make the other charges.  We disagree.

North Carolina Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2013).  "In evaluating the admissibility of Rule 404(b) evidence, we start by determining whether there was substantial evidence presented by the State tending to support a reasonable finding by the jury that the defendant committed the other crimes, wrongs, or acts."  *State v. Adams*, 220 N.C. App. 319, 322, 727 S.E.2d 577, 580 (2012).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* at

323, 727 S.E.2d at 580 (internal quotation marks omitted). "The prosecution can present either direct or circumstantial evidence so long as it tends to support a *reasonable* inference that the same person committed both the earlier and later acts." *Id.* (internal quotation marks omitted). "If the State does offer substantial evidence tending to support a reasonable finding by the jury that the defendant committed the other crimes, wrongs, or acts, then we must conduct a three-pronged analysis regarding the admissibility of the 404(b) evidence." *Id.* "This three-pronged analysis requires that we first determine whether the evidence was offered for a proper purpose under Rule 404(b), then determine whether the evidence is relevant under Rule 401, and finally determine whether the trial court abused its discretion in balancing the probative value of the evidence under Rule 403." *Id.* at 323, 727 S.E.2d at 580–81 (internal quotation marks omitted). "The standard of review applied to the first two prongs of our analysis is *de novo* as the crux of both prongs is relevancy; that is, whether the evidence is *relevant* to a permissible purpose under Rule 404(b) and whether that purpose is relevant to the proceeding under Rule 401." *Id.* at 323, 727 S.E.2d at 581. "Further, a trial court's rulings on relevancy are technically not discretionary, though we accord them great deference on appeal." *Id.* (internal quotation marks omitted). "The standard of review

applied to the third prong is abuse of discretion." *Id.*

Defendant asserts that the State failed to present evidence that she made the charges listed in State's Exhibit 1, other than the charges at Target and the Dry Cleaning Spot. However, the evidence presented at trial tended to show that the other charges were made at locations close to Belk's where both Defendant and Mrs. Murray worked. These locations included several restaurants across the street, ExxonMobil, Shell Oil, Yellow Cab, and Charlotte Area Transit. Additionally, one of those restaurants, Belk Cafe, was accessible only by employees in the Belk office building. Mrs. Murray also testified that she rarely ate out for lunch, and tended to eat lunch at her desk. Mrs. Murray further testified that, other than a few restaurants directly across the street, she did not know the locations of ExxonMobil, Original Pancake House, Papa John's, or Shell Oil.

All the other charges were made on the same card between 29 April 2011 and 12 May 2011, which is the same period when Mrs. Murray's card was used at the Dry Cleaning Spot and Target. Mr. Vranek also testified that, during the phone call with Defendant, Defendant admitted to taking Mrs. Murray's card from her desk and then "us[ing] it in several different places, one was the dry cleaner, one was Target, [and] there were a few others." Finally, Mrs. Murray and Defendant had adjoining cubicles. Taken together,

we conclude that the State presented substantial evidence tending to support a reasonable finding by the jury that Defendant committed the other wrongs or acts at issue in State's Exhibit 1.

Upon admitting the evidence, the trial court provided the jury with the following limiting instruction:

> Ladies and gentlemen, as to State's Exhibit 1, it's admitted for two purposes. One, the charges shown to the Dry Clean[ing] Spot on May 4, 2011, and to Target on May 8, 2011, are admitted for substantive evidence in this case on the crimes charged.
>
> The other charges listed are admitted for a different reason. So to give you the instruction regarding that, evidence is being received tending to show charges other than those charged — other than those charges involved in this case. This evidence is received solely for the purpose of showing the identity of the person who committed the crime charged in this case, if it was committed, that the defendant had a motive for the commission of the crime charged in this case; that the defendant had the intent necessary for the crime charged in this case; that the defendant had the knowledge which is — strike that — that there existed in the mind of the defendant a plan, scheme, system or design involving the crime charged in this case; that the defendant had the opportunity to commit the crime.
>
> If you believe this evidence, you may consider it only for the limited purpose for which it was received. You may not consider it for any other purpose.

The trial court gave this instruction before State's Exhibit 1 was published to the jury, and reiterated this limiting instruction

again when it charged the jury before deliberations. Based on our review of the record before us, we conclude that the purposes for which the trial court admitted the evidence were proper, the evidence was relevant to the proceeding, and the trial court "guarded against the possibility of prejudice" by instructing the jury to consider the evidence only for those proper purposes. *See State v. Hyatt*, 355 N.C. 642, 662, 566 S.E.2d 61, 74–75 (2002), *cert. denied*, 537 U.S. 1133, 154 L. Ed. 2d 823 (2003). Therefore, we hold the trial court did not err by admitting the evidence of other credit card charges in State's Exhibit 1.

D.   Challenge to Admission of Surveillance Videotape Evidence

Finally, Defendant argues the trial court erred by admitting a videotape showing a transaction in a Target store because the State failed to establish a proper foundation for admission of the videotape. Specifically, Defendant asserts that a proper foundation was not laid because the State failed to establish that the surveillance video accurately presented the events depicted. We disagree.

This Court reviews whether a sufficient foundation was laid for the admission of videotape surveillance evidence on an abuse of discretion standard. *See State v. Cook*, 218 N.C. App. 245, 251–52, 721 S.E.2d 741, 746, *appeal dismissed and disc. review denied*, 367 N.C. 212, 747 S.E.2d 249 (2012).

"Any party may introduce a photograph, video tape, motion picture, X-ray or other photographic representation as substantive evidence upon laying a proper foundation and meeting other applicable evidentiary requirements."  N.C. Gen. Stat. § 8-97 (2013).  A proper foundation can be laid if any of the following four elements are met:

> (1) Testimony that the motion picture or videotape fairly and accurately illustrates the events filmed; (2) proper testimony concerning the checking and operation of the video camera and the chain of evidence concerning the videotape; (3) testimony that the photographs introduced at trial were the same as those [the witness] had inspected immediately after processing; or (4) testimony that the videotape had not been edited, and that the picture fairly and accurately recorded the actual appearance of the area photographed.

*Cook*, 218 N.C. App. at 252, 721 S.E.2d at 746 (internal quotation marks omitted).  There are "three significant areas of inquiry" for a court reviewing the foundation for admissibility of a videotape:  "(1) whether the camera and taping system in question were properly maintained and were properly operating when the tape was made, (2) whether the videotape accurately presents the events depicted, and (3) whether there is an unbroken chain of custody." *State v. Mason*, 144 N.C. App. 20, 26, 550 S.E.2d 10, 15 (2001). Where photographic evidence is "introduced as evidence of the crime itself, and not as illustrative evidence, there [is] no need to

have a witness testify that they fairly and accurately represent[] the scene described by testimony." *State v. Kistle*, 59 N.C. App. 724, 726, 297 S.E.2d 626, 627 (1982), *disc. review denied*, 307 N.C. 471, 298 S.E.2d 694 (1983).

This Court has determined that a proper foundation for the admission of videotape evidence has been laid where a witness, who "admitted that he did not know how the doggone [camera system] works," *Cook*, 218 N.C. App. at 252, 721 S.E.2d at 747 (internal quotation marks omitted), could testify that "he viewed the surveillance video as the technician made a copy of the footage immediately following the incident," *id*. at 252–53, 721 S.E.2d at 747, and further testified that "the footage presented in court was the same as that which he viewed when the copy was being made from the surveillance system's server a few days after the theft." *Id*. at 253, 721 S.E.2d at 747. Similarly, this Court has determined that a proper foundation was laid for the admission of surveillance video where a policewoman followed standard procedures to establish a chain of custody and testified "the images on the tape had not been altered and were in the same condition as when she had first viewed them on the day of the robbery." *Mewborn*, 131 N.C. App. at 499, 507 S.E.2d at 909.

In the present case, the videotape at issue was admitted as substantive evidence; thus, in order for the State to lay a proper

foundation, it was unnecessary for Mr. Griffin to testify that the events depicted on the videotape accurately represented the scene. Here, Mr. Griffin was asked to pull a surveillance video for credit card transactions using Mrs. Murray's credit card and Chante Sterling's credit card which occurred one minute apart at a Target store.  Mr. Griffin testified he pulled this video upon the request of a detective, saved it to his computer, then burned this to a disc, deleted the video from the computer, and then placed the disc in a locked file cabinet.  Mr. Griffin also testified that he had personally viewed the surveillance video and that it was the same video as the video played at trial.  Moreover, Mr. Griffin had reviewed close to a hundred surveillance videos in the course of his work, and based on his understanding and experience, this video came from a properly functioning and properly maintained camera.  Therefore, we conclude that Mr. Griffin's testimony was sufficient to establish that the chain of custody was unbroken and that the camera and taping system were properly maintained and were properly operating when this videotape was made.  Accordingly, the trial court did not abuse its discretion by admitting the videotape evidence.

## III. Conclusion

In sum, both the indictments for the charges of obtaining property by false pretense and identity fraud were specific enough

to inform Defendant of the offenses with which she was charged. The trial court did not err by admitting testimony from Mr. Vranek and from Ms. Washington-Dean regarding their phone call with Defendant because there was sufficient evidence to establish Defendant as the person with whom the witnesses were speaking. The trial court did not err by admitting evidence of the other credit card charges in State's Exhibit 1 because there was substantial evidence establishing Defendant as the person who made those other charges.  Finally, the trial court did not err by admitting the surveillance video because a proper foundation was laid for the admission of this evidence.

No error.

Judges CALABRIA and McCULLOUGH concur.

Report per Rule 30(e).